# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MATTHEW GODDEN AND TOBIAS BACHTELER, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2018-0504-VCL |
| HARLEY V. FRANCO, | ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: August 14, 2018
Date Decided: August 21, 2018

Samuel T. Hirzel, II, Melissa N. Donimirski, Elizabeth A. DeFelice, HEYMAN ENERIO GATTUSO & HIRZEL, LLP, Wilmington, Delaware; Kevin H. Marino, John D. Tortorella, John A. Boyle, MARINO, TORTORELLA & BOYLE, P.C., Chatham, New Jersey; Kostas D. Katsiris, VENABLE LLP, New York, New York, *Counsel for Plaintiffs*.

Elena C. Norman, Richard J. Thomas, Benjamin M. Potts, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Robert M. Sulkin, Gregory J. Hollon, MCNAUL, EBEL, NAWROT & HELGREN PLLC, Seattle, Washington, *Counsel for Defendant*.

**LASTER, V.C.**

Plaintiffs Matthew Godden and Tobias Bachteler acted by written consent to terminate defendant Harley Franco from his positions as President and CEO of Harley Marine Services, Inc. ("HMS Inc.").[1] At the time they took action by written consent, the plaintiffs comprised two of the four members of the board of managers of three Delaware limited liability companies: HMS Holdings 1, LLC ("Holdco 1"), HMS Holdings 2, LLC ("Holdco 2"), and HMS Holdings 3, LLC ("Holdco 3"). As their names suggest, the three Holdco entities constitute a three-tiered holding company structure for HMS Inc.

The plaintiffs acted by written consent at each of the three Holdco entities, but the top-tier LLC—Holdco 3—is the most important. Its LLC agreement contains provisions (i) specifying the voting standard for its board of managers to make any decisions regarding Franco's employment agreement, (ii) authorizing the board of managers of Holdco 3 to determine the officers of its subsidiaries, including HMS Inc., and (iii) committing the parties to the LLC agreement to conform the composition of the governing boards of Holdco 3's subsidiaries to the size and makeup of the board of managers of Holdco 3. It also contains a provision binding Franco to abide by the terms of the Holdco 3 LLC agreement, and Franco is personally a party to the Holdco 3 LLC agreement for purposes of that provision.

---

[1] HMS Inc. is not the most felicitous abbreviation. I experimented with more descriptive and easily remembered terms, but HMS Inc. appears frequently in the governing documents, so this decision uses it. To dilute the alphabet soup that the parties served up, this decision uses more descriptive terms for other entities.

The plaintiffs moved for summary judgment seeking a lengthy list of declarations regarding the validity of the actions they took. Several of those requests have been rendered moot. This decision grants the plaintiffs' motion as to the following declarations:

- The decision to terminate Franco under his employment agreement was an Interested Party Decision as defined in Section 1.10(a)(iv) of the Holdco 3 LLC agreement.

- Because the termination decision was an Interested Party Decision under Section 1.10(a)(iv) of the Holdco 3 LLC agreement, the only votes required to make the decision were those of the Independent Manager and the Macquarie Manager, as those terms are defined in the Holdco 3 LLC agreement.

- Under Section 4.1(a) of the Holdco 3 LLC agreement, the Independent Manager and the Macquarie Manager could act by written consent to make the decision to terminate Franco under the employment agreement, and the resulting written consent constitutes validly binding action by the board of managers of Holdco 3.

- Assuming that the board of managers of Holdco 3 made the termination decision, that decision would not be self-executing at each of Holdco 3's subsidiaries, nor would it be a legal nullity at Holdco 3's subsidiaries. Instead, the parties to the Holdco 3 LLC agreement would be bound contractually to take implementing action at each of Holdco 3's subsidiaries to make the decision effective.

- Assuming that the board of managers of Holdco 3 made the termination decision, then as a party to the Holdco 3 LLC agreement who committed personally to abide by its terms, Franco would be bound contractually to implement the board of managers' decision at Holdco 3's subsidiaries. The extent to which Franco would be obligated to comply with that contractual commitment for purposes of action at HMS Inc. raises knotty issues of Washington law.

- Assuming that the board of managers of Holdco 3 made the termination decision, then Franco does not cease serving as Chairman of the Board of the Holdco 3 Board of Managers until implementing action is taken by HMS Inc.

- Under Section 4.5 of the Holdco 3 LLC agreement, the parties agreed that the composition of the governing boards of the Holdco entities, HMS Inc., and all of its subsidiaries must be the same.

This decision does not declare that Godden and Bachteler acted validly by written consent to terminate Franco. Franco has raised a narrow dispute of material fact as to whether

2

Godden met one of the qualifications necessary to act as the Independent Manager at the time he exercised the written consent. Summary judgment as to this issue is denied.

## I.    FACTUAL BACKGROUND

The facts for purposes of this decision are drawn from the exhibits to the verified complaint, the pleadings (which have closed), and the affidavits and documents that the parties submitted in connection with the plaintiffs' motion for summary judgment. Because the plaintiffs moved for summary judgment, the defendant receives the benefit of any reasonable inferences that can be drawn from the record.

### A.    The Holdco Structure

HMS Inc. is a marine transportation company. Through various subsidiaries, it conducts multiple lines of marine-related business, operates approximately 120 vessels, and employs approximately 800 people. HMS Inc. is not a Delaware corporation; it was formed under the laws of the State of Washington.

Harley V. Franco founded HMS Inc. in 1987. In 2008, Franco sold a significant equity stake in HMS Inc., amounting to beneficial ownership of just under half of its stock, to Macquarie Capital, a private equity firm.[2] To comply with regulatory requirements, the parties created a complex, multi-tiered ownership structure.

Four tiers of ownership are relevant to this proceeding. In the first tier, Holdco 1 owns 100% of the equity of HMS Inc. Holdco 1 has two members, constituting the second

---

[2] Macquarie invested through specific entities, but they are not important for purposes of this decision's analysis. For simplicity, this decision refers only to Macquarie.

3

tier: Macquarie owns a 23.36% member interest in Holdco 1, and Holdco 2 owns a 76.64% member interest in Holdco 1. Holdco 2 itself has two members, constituting the third tier. At this level, Macquarie owns a 17.78% member interest in Holdco 2, and Holdco 3 owns an 82.22% member interest in Holdco 2. Holdco 3 likewise has two members, creating the fourth tier of ownership. At this level, Macquarie owns a 15.44% member interest in Holdco 3, and HMS Partners, LLC, owns a 84.56% member interest in Holdco 3. Franco controls HMS Partners, LLC; to avoid introducing another HMS-based abbreviation, this decision calls it "Franco Partners." The following organization chart depicts the resulting structure:



Each of the three Holdco entities is a Delaware LLC. The three LLCs are governed by virtually identical LLC agreements. Each LLC agreement was executed initially as of May 14, 2008. All three have been amended in parallel over the years. The currently

4

operative versions are the Second Amended and Restated LLC agreements, each dated June 18, 2014.[3] The terms of the agreements reflect their coordinated preparation.

Each Holdco is a manager-managed LLC, and the business and affairs of each Holdco is governed by a board of managers (the "Board of Managers"). Section 4.1(a) of each LLC agreement provides that the each Board of Managers shall have four members. Section 4.1(b) specifies that the members shall be as follows:

(i) two (2) managers who are Citizens of the United States to be selected by [Franco Partners] (each, a "Franco Manager");

(ii) one (1) manager to be selected by [Macquarie] (the "Macquarie Manager");

(iii) one (1) manager who is a Citizen of the United States that is independent from and is not under the Control of or under common Control with [Macquarie], [Franco Partners] or any of their respective Affiliates (including pursuant to any contract or by virtue of being an existing or former employee of [Macquarie], [Franco Partners] or any of their Affiliates) who shall have prior (i) senior management experience in either the petroleum or shipping industry; and (ii) financial experience with responsibility to manage a profit/loss statement greater than $50,000,000.00, to be jointly selected by [Macquarie] and [Franco Partners] (the "Independent Manager") . . . .

At the time of the events giving rise to this dispute, Franco and Richard Padden were the Franco Managers, Bachteler was the Macquarie Manager, and Godden was the Independent Manager. Godden also served as a Senior Vice President and Chief Operating Officer of HMS Inc.

---

[3] The operative LLC agreements for Holdco 1, 2, and 3 can be found, respectively, at Compl. Exs. K, L, and M. Because this decision focuses on the LLC agreement of Holdco 3, all textual references to LLC agreement provisions cite that agreement, unless otherwise specified.

5

Section 4.1(d) of each of the LLC agreements states that "[t]he Board Members shall elect a Chairman of the Board to preside over meetings of the Board of Managers." It further states:

> For a ten (10) year period commencing on the date of the closing of the Acquisition, the Chairman of the Board shall be Franco (unless Franco declines or is unable to serve as Chairman of the Board), but only if (i) [Franco Partners] retains the right to appoint at least (1) Board Member and (ii) Franco has not been terminated by HMS Inc. "for cause" under his Employment Agreement. Thereafter, the Chairman of the Board shall be a Citizen of the United States elected annually by the Board of Managers.

At the time of the events giving rise to this dispute, Franco served as the Chairman of the Board for each Board of Managers.

For purposes of this litigation, there are three key respects in which the Holdco 3 LLC agreement differs from the lower-tier LLC agreements. First, Franco executed the Holdco 3 LLC agreement personally and became a party in his individual capacity "for purpose of Section 15.13." That section provides as follows:

> Franco hereby covenants and agrees for the benefit of the Company and the Members
>
> (a) to cause [Franco Partners] to perform all of its obligations under this Agreement,
>
> (b) that he shall at all times maintain Control of [Franco Partners], and
>
> (c) to abide by the provisions set forth in this Agreement and in the limited liability company agreements (as amended, modified or restated from time to time) of Holdco 1 and Holdco 2 that apply to him in his individual capacity.[4]

---

[4] Compl. Ex. M § 15.13 (formatting added).

6

This decision refers to Section 15.13 as the "Personal Commitment Provision." The LLC agreements for Holdco 1 and Holdco 2 do not contain a Personal Commitment Provision, and Franco is not a party to those LLC agreements in his individual capacity.

Second, the Holdco 3 LLC agreement contains language that authorizes the Board of Managers of Holdco 3 to select the officers of Holdco 3's subsidiaries (the "Subsidiary Officer Provision"). In Sections 4.10 through 4.17, the Holdco 3 LLC agreement identifies various officer positions of Holdco 3, including the positions of President and Chief Executive Officer. In Section 4.19, titled "Officers of Subsidiaries," the Holdco LLC agreement states: "All officers of the other Company Entities shall be selected by the Board of Managers in its sole discretion." In Section 1.10, the LLC agreement defines "Company Entities" to mean, "collectively, [Holdco 3], Holdco 1, Holdco 2, and HMS Inc., including all subsidiaries of HMS Inc. as set forth on Appendix I attached hereto." The LLC agreements for Holdco 1 and Holdco 2 do not contain a comparable provision, which is unsurprising: Given that the Subsidiary Officer Provision seeks to authorize the Board of Managers of Holdco 3 to appoint officers for all of its subsidiaries, it would be counterintuitive and potentially conflict-generating to include a similar provision in the lower-tier agreements.

Third, the Holdco 3 LLC agreement contains language that obligates the parties to that agreement to conform the governing boards of all of Holdco 3's subsidiaries so that they correspond to the composition of the Board of Managers of Holdco 3 (the "Subsidiary Board Provision"). Titled "Boards of Managers and Directors of the Company's Subsidiaries," Section 4.5 of the Holdco 3 LLC agreement states:

7

The composition of the board of managers or the board of directors, as applicable, of each other Company Entity . . . shall consist of the same number of managers or directors, as applicable, and shall also consist of the same persons as that of the Board of Managers (collectively, the "Boards").

The Members shall have the same rights to designate members of the Boards of the other Company Entitles as they have to designate Board Members, and such designation rights shall be subject to the same limitations and conditions as apply to their rights to designate Board members.

In any instance in which [Holdco 3] or any other Company Entity has the right to designate [1] a member of the board of managers or the board of directors, as applicable or [2] an observer of any Company Entity based on the HMS Percentage Interest held by Franco, directly or indirectly, [Holdco 3] shall comply, and shall cause each other Company Entity to comply, with the direction of [Franco Partners] with respect to the designation of a person to the board of managers or the board of directors, as applicable, or as an observer.

The Members acknowledge and agree that any amendment to the number of Board Members or change of any Board Member shall also amend and apply to the composition of the Boards of each other Company Entity.

The manner of meeting and acting of the Boards of the other Company Entities shall be consistent in all respects with this Article IV.[5]

As with the Subsidiary Officer Provision, the LLC agreements for Holdco 1 and Holdco 2 do not contain comparable provisions, and logically so, since the parties were basing the governing boards of the subsidiaries off of the Board of Managers of Holdco 3.

**B.      The Washington Action and the Delaware Derivative Action**

In late May 2018, Godden advised Macquarie that Franco had been misappropriating funds from HMS Inc. Macquarie retained litigation counsel, who obtained books and records from HMS Inc. to evaluate whether the allegations were true.

---

[5] *Id.* § 4.5 (formatting added).

Macquarie then engaged AlixPartners LLP to review the books and records. AlixPartners corroborated Godden's allegations to Macquarie's satisfaction. Franco disputes whether the allegations have any basis in fact.

After receiving corroboration from AlixPartners, Macquarie asked Franco to step down temporarily from his positions. In response, on July 2, 2018, Franco filed suit against Macquarie in Washington state court (the "Washington Action").[6] In his complaint, Franco alleged that Macquarie had breached its fiduciary duties by trying to force him out of office and pressure him into selling HMS Inc. He also sought declarations regarding the corporate governance structure of HMS Inc. under Washington law.

On July 3, 2018, Macquarie filed a derivative action against Franco in this court (the "Delaware Derivative Action"). In its complaint, Macquarie sought a declaration that there was good cause to terminate Franco and remove him from all of his board and officer positions. Macquarie also sought compensatory damages.

## C.    The July 5 Board Meeting And The Dismissal Of The Delaware Derivative Action

At 11:00 a.m., on July 5, 2018, Godden and Bachteler purported to hold an emergency meeting of the board of directors of HMS Inc. (the "Contested Meeting").[7] They later claimed that they also convened the Contested Meeting on behalf of the governing boards of the Holdcos and HMS Inc.'s subsidiaries. They have asserted that during the

---

[6] Compl. Ex. G.

[7] *See* Dkt. 46 Ex. H.

Contested Meeting, they voted on behalf of all of the governing boards of the entities to terminate Franco's employment for cause.

Franco and Padden received notice of the Contested Meeting but did not participate. Franco has taken the positon that Godden and Bachteler only called a meeting of the board of directors of HMS Inc. He also contends that because he and Padden did not attend, a quorum did not exist, and no action was validly taken during the Contested Meeting.

The plaintiffs have represented that they are not relying on any action taken during the Contested Meeting for purposes of their motion for summary judgment. This decision relies on that representation and does not delve into any of the disputes about the Contested Meeting. This approach is the functional equivalent of assuming, for purposes of analysis, that the Contested Meeting was not validly called on behalf of any entity other than HMS Inc. and, in any event, lacked a quorum for taking action. This assumption comports with the standard governing a motion for summary judgment under Rule 56, in which the non-moving party receives the benefit of the doubt on any contested issues of fact.

After the Contested Meeting, Godden and Bachteler believed that they had terminated Franco from his positions as President and CEO of HMS Inc. Terminating Franco had been the principal goal of the Delaware Derivative Action, so on the afternoon of July 5, Macquarie filed a notice of voluntary dismissal without prejudice. After convening a status conference, I granted the dismissal.[8]

---

[8] *See* Dkt. 46 Ex. I.

**D. The Written Consent**

Before and during the status conference, Franco raised objections to the validity of the actions taken during the Contested Meeting. To address those objections, on the evening of July 5, 2018, Godden and Bachteler purported to take action by written consent on behalf of the Boards of Managers of the Holdcos, the board of directors of HMS Inc., and the governing boards of each of HMS Inc.'s subsidiaries (the "Written Consent"). This decision addresses only whether the Written Consent took valid action on behalf of the Boards of Managers of the Holdcos. It analyzes that issue from the standpoint of the Board of Managers of Holdco 3. That entity is the important one, because Franco signed its LLC agreement personally, and its LLC agreement contains the Personal Commitment Provision, the Subsidiary Officer Provision, and the Subsidiary Board Provision. The analysis is the same for the other Holdcos, but the implications are limited to those entities.

The Written Consent stated as follows:

> **NOW, THEREFORE, BE IT RESOLVED**, that the employment of Franco with HMS [Inc.] is hereby terminated for cause pursuant to Section 6.1(d) of that certain Employment Agreement, dated August 15, 2008, by and between HMS [Inc.] and Franco;
>
> **FURTHER RESOLVED**, that Franco is hereby removed as the President and Chief Executive Officer of each, and from any other officer positions he holds with any of the Companies and any other subsidiaries of HMS [Inc.]; and
>
> **FURTHER RESOLVED**, that Franco is hereby removed as Chairman of the Boards of the Companies and any other subsidiaries of HMS [Inc.].[9]

---

[9] Compl. Ex. F.

11

The Written Consent defined "Companies" as the Holdcos, HMS Inc., and ten subsidiaries of HMS Inc.

Godden and Bachteler executed the Written Consent in their capacities as members of the governing boards of the Companies. Pertinent for present purposes, they executed it in their capacities as, respectively, the Independent Manager and Macquarie Manager of Holdco 3. If the Written Consent is valid, then it represents a duly authorized decision by the Board of Managers of Holdco 3.

### E.     The Washington Injunction

On July 6, 2018, Franco filed an amended complaint in the Washington Action that added Godden and Bachteler as defendants.[10] The amended complaint sought declarations that (i) Godden and Bachteler faced conflicts of interest that prevented them from taking any action regarding Franco's role at HMS Inc. or any of its related entities, and (ii) Godden and Bachteler had not validly taken any action during the Contested Meeting. Franco also sought injunctive relief that would permit him to remain in the positions of President and CEO during the pendency of the litigation. Franco moved for a temporary restraining order to prevent any actions taken by Godden and Bachteler during the Contested Meeting from going into effect. On July 6, 2018, a commissioner of the Washington State Superior Court issued a temporary restraining order which provided that Franco would remain in office until a full hearing on the order to show cause for a preliminary injunction.[11]

---

[10] Compl. Ex. H.

[11] Compl. Ex. J.

12

On July 10, 2018, Franco sent an email to Bachteler, Godden, and HMS Inc.'s corporate counsel in which he purported to revoke his consent to Godden serving as the Independent Manager. His email implied that by virtue of this act, Godden either was removed as Independent Manager or could no longer function as the Independent Manager. In a subsequent email, Franco confirmed that this was his position, asserting that none of the governing boards could meet until a new Independent Manager was appointed.

## F. This Litigation

On July 11, 2018, Godden and Bachteler filed the complaint in this action. they sought declarations regarding the validity of the actions they purportedly took during the Contested Meeting and through the Written Consent. They moved for expedited treatment.

After a hearing on July 19, 2018, I granted the motion to expedite, but limited the grant of expedition to issues under Delaware law relating to the Holdcos.[12] I found that the parties' disputes over whether Franco had been removed as President and CEO of the Holdcos, whether he continued to serve as Chairman of the Boards of Managers of the Holdcos, and whether Godden continued to serve as an Independent Manager raised questions about who controlled three Delaware entities and who held title to offices at those entities. I reasoned that in that scenario, the existence of a prior pending action in Washington did not prevent this court from going forward and that it was more efficient and appropriate for this court to adjudicate matters involving the Holdcos, which are entities formed under Delaware law. At the same time, I concluded that for similar reasons

---

[12] Dkt. 30.

13

it was more efficient and appropriate for the Washington State Superior Court to adjudicate matters involving HMS Inc., which is an entity formed under Washington law.

To facilitate prompt resolution of these matters, I ordered Franco to file a substantive answer to the complaint, and I granted the plaintiffs leave to file a motion for summary judgment. The parties complied. Argument on the motion took place on August 14, 2018.

## II.    LEGAL ANALYSIS

Under Court of Chancery Rule 56(c), summary judgment may be granted when "there is no genuine issue as to any material fact" and the "moving party is entitled to judgment as a matter of law."[13] "The role of a trial court . . . is to identify disputed factual issues whose resolution is necessary to decide the case, but not to decide such issues. In discharging this function, the court must view the evidence in the light most favorable to the non-moving party."[14] "Summary judgment is particularly appropriate in a dispute over an unambiguous contract because there is no need to resolve material disputes of fact."[15]

---

[13] Del. Ct. Ch. R. 56(c).

[14] *Merrill v. Crothall-American, Inc.*, 606 A.2d 96, 99 (Del. 1992) (citation omitted).

[15] *XO Comm., LLC v. Level 3 Comm., Inc.*, 948 A.2d 1111, 1124 (Del. Ch. 2007) (internal quotation marks omitted) (quoting *NBC Universal, Inc. v. Paxson Commcn's Corp.*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005). *See also The HC Cos., Inc. v. Myers Indus., Inc.*, 2017 WL 6016573, at *5(Del. Ch. Dec. 5, 2017) (granting motion for summary judgment on plaintiff's breach of contract claim); *West Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*, 2007 WL 3317551, *9, *13 (Del. Ch. Nov. 2, 2007) (same).

14

It is frequently observed that LLCs "are creatures of contract,"[16] which they primarily are.[17] The first step when analyzing a case involving the internal affairs of an LLC is therefore to examine the LLC agreement to determine whether it addresses the issue. If it does, then the contract controls,[18] unless the provision violates one of the

[16] *TravelCenters of Am., LLC v. Brog*, 2008 WL 1746987, at *1 (Del. Ch. Apr. 3, 2008); *accord, e.g.*, *Henson v. Sousa*, 2015 WL 4640415, at *1 (Del. Ch. Aug. 4, 2015) ("LLCs, as this Court has repeatedly pointed out, are creatures of contract."); *Touch of It. Salumeria & Pasticceria, LLC v. Bascio*, 2014 WL 108895, at *4 (Del. Ch. Jan. 13, 2014) ("[R]ecognizing that LLCs are creatures of contract, I must enforce LLC agreements as written."); *Kuroda v. SPJS Hldgs., LLC*, 971 A.2d 872, 880 (Del. Ch. 2009) ("Limited liability companies are creatures of contract . . . ."); *see Fisk Ventures LLC v. Segal*, 2008 WL 1961156, at *8 (Del. Ch. May 7, 2008) ("In the context of limited liability companies, which are creatures . . . of contract, those duties or obligations [among parties] must be found in the LLC agreement or some other contract." (footnote omitted)).

[17] The adverb "primarily" is important and should not be overlooked. *See In re Seneca Invs. LLC*, 970 A.2d 259, 261 (Del. Ch. 2008) ("An LLC is primarily a creature of contract . . . ."). There are "core attributes of the LLC" that are not contractual and which "only the sovereign can authorize, such as its separate legal existence, potentially perpetual life, and limited liability for its members." *In re Carlisle Etcetera LLC*, 114 A.3d 592, 605-06 (Del. Ch. 2015); *see* 6 *Del. C.* §§ 18-201, 18-303. An LLC agreement cannot be an exclusively private contract among its members "precisely because the LLC has powers that only the State of Delaware can confer." *Carlisle*, 114 A.3d at 606; *see Feeley v. NHAOCG, LLC*, 62 A.3d 649, 659-63 (Del. Ch. 2012); *Auriga Capital Corp. v. Gatz Props., LLC*, 40 A.3d 839, 849-56 (Del. Ch. 2012) (Strine, C.), *aff'd*, 59 A.3d 1206 (Del. 2012). Professor Manesh has identified a baker's-dozen reasons why LLCs are not wholly contractual and only partially creatures of contract. *See* Mohsen Manesh, *Creatures of Contract: A Half-Truth About LLCs*, 42 Del. J. Corp. L. 391 (2018). *See generally* Daniel S. Kleinberger, *Two Decades of "Alternative Entities": From Tax Rationalization Through Alphabet Soup To Contract As Deity*, 14 Fordham J. Corp. & Fin. L. 445, 460-71 (2009) (identifying historical, jurisprudential, and policy reasons why LLCs should not be regarded as purely contractual entities); Sandra K. Miller, *The Best of Both Worlds: Default Fiduciary Duties and Contractual Freedom in Alternative Business Entities*, 39 J. Corp. L. 295, 315-24 (2014) (reviewing empirical studies and presenting data about alternative entity agreements that undermine premises of purely contractarian approach).

[18] *Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 291 (Del. 1999); *see Levey v. Brownstone Asset Mgmt., LP*, 2014 WL 3811237, at *7 (Del. Ch. Aug. 1, 2014); Robert L.

exceedingly few mandatory provisions in the LLC Act.[19] If the LLC agreement is silent, then the next step is to look to the LLC Act to see if one of its default provisions applies.[20] If neither source addresses the matter, then the LLC Act instructs that "the rules of law and equity . . . shall govern."[21]

In this case, the parties debate the meaning of specific provisions in the LLC agreements that address the subjects in question. To reiterate, this decision analyzes the issues under the LLC agreement of Holdco 3, because that is the agreement that Franco signed in his individual capacity and which contains the Personal Commitment Provision, the Subsidiary Officer Provision, and the Subsidiary Board Provision.

When analyzing an LLC agreement, a court applies the same principles that are used when construing and interpreting other contracts.[22] "When interpreting a contract, the role

---

Symonds, Jr. & Matthew J. O'Toole, *Delaware Limited Liability Companies* § 1.03[A] [2], at 1–14 (2018 Supp.).

[19] *See* Manesh, *supra*, at 420-24 (identifying non-contractible features of an LLC agreement); *see also Walker v. Res. Dev. Co., L.L.C. (DE)*, 791 A.2d 799, 813 (Del. Ch. 2000) ("Once members exercise their contractual freedom in their limited liability company agreement, they can be virtually certain that the agreement will be enforced in accordance with its terms.").

[20] *Elf Atochem*, 727 A.2d at 291; *see Levey*, 2014 WL 3811237, at *7; Symonds & O'Toole, *supra*, § 1.03[A] [2], at 1–14.

[21] 6 *Del. C.* § 18-1104.

[22] *See Aloha Power Co. v. Regenesis Power, LLC*, 2017 WL 6550429, at *5 n.34 (Del. Ch. Dec. 22, 2017); *RED Capital Inv. L.P. v. RED Parent LLC*, 2016 WL 612772, at *2 (Del. Ch. Feb. 11, 2016); *Mickman v. Am. Int'l Processing, LLC*, 2009 WL 2244608, at *2 (Del. Ch. July 29, 2009)).

of a court is to effectuate the parties' intent."[23] Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement construing the agreement as a whole and giving effect to all its provisions."[24] The "contract's construction should be that which would be understood by an objective, reasonable third party."[25] The contract's "terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."[26] A court applying Delaware law will "construe the contract in accordance with that plain meaning and will not resort to extrinsic evidence to determine the parties' intentions."[27] "Contract language is not ambiguous merely because the parties dispute what it means. To be ambiguous, a disputed contract term must be fairly or reasonably susceptible to more than one meaning."[28]

---

[23] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[24] *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014).

[25] *Id.* at 367-68.

[26] *GMG Capital Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012) (internal quotation marks omitted) (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)).

[27] *BLG Hldgs. LLC v. enXco LFG Hldg., LLC* , 41 A.3d 410, 414 (Del. 2012).

[28] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012) (footnote omitted).

**A.     Whether Terminating Franco Is An Interested Party Decision**

The plaintiffs seek a declaration that the decision to terminate Franco under the Employment Agreement was an Interested Party Decision under the Holdco 3 LLC agreement. The plain language of the Holdco 3 LLC agreement establishes that it was.

Under the definition set out in Section 1.10 of the Holdco 3 LLC agreement, the term "Interested Party Decision" encompasses five categories of matters. Subparagraph (a) refers to "the exercise of" a "Company Entity's rights" under specified contracts, including "HMS Inc.'s rights under the Employment Agreement, including any determination to terminate employment thereunder for cause."[29] The definition of Interested Party Decision expressly calls out the decision to terminate Franco under his Employment Agreement.

Accordingly, the decision to terminate Franco for cause under the Employment Agreement is declared to be an Interested Party Decision under the Holdco 3 LLC agreement. Summary judgment is granted in favor of the plaintiffs on this issue.

**B.     Whether The Only Votes Required To Terminate Franco Under His Employment Agreement Are Those Of The Independent Manager And The Macquarie Manager**

The plaintiffs seek a declaration that the only votes required to terminate Franco under his Employment Agreement were those of the Independent Manager and the Macquarie Manager. That is correct.

---

[29] Compl. Ex. M § 1.10 (definition of "Interested Party Decision" subparagraph (a)(iv)).

18

Section 4.1(a) the Holdco 3 LLC agreement states the vote required for the Board

of Managers to take valid action at a meeting at which a quorum is present:

> All matters required to be submitted by Law or otherwise for vote or action by the Board of Managers shall require approval of a majority of the Board Members present at a meeting of the Board of Managers at which a quorum is present; provided, however, that
>
> (i)      any Unanimous Board Decision shall require the unanimous approval of all Board Members required to constitute a quorum of the Board of Managers;
>
> (ii)    any Interested Party Decision under subparagraph (a), (c) or (d) of the definition of Interested Party Decision shall require the approval of a majority of the Board Members other than the Franco Managers, and
>
> (iii)   any Interested Party Decision under subparagraph (b) of the definition of Interested Party Decision shall require the approval of a majority of the Board Members other than the Macquarie Manager.[30]

Section 4.1(c) of the LLC agreements states that "[t]he attendance or participation of all

four (4) Managers shall be required to constitute a quorum of the Board of Managers."

Section 4.1(a) creates a general requirement for board action: the vote of a majority

of the Board Members present at a meeting where a quorum is present, which effectively

means three out of four managers. The three subsections in Section 4.1(a) then create three

special decision-making rules: one for Unanimous Board Decisions, where (not

surprisingly) unanimity is required, and two for matters involving Interested Party

Decisions. When making an Interested Party Decision that implicates the interests of

Franco, the standard for valid board action does not require the approval of the Franco

Members. It requires only a majority of the remaining members, *i.e.*, the Independent

---

[30] Formatting added.

19

Manager and the Macquarie Manager. When making an Interested Party Decision that implicates the interests of Macquarie, the standard is reciprocal. Valid board action does not require the approval of the Macquarie Member. It requires only a majority of the remaining members, *i.e.*, the Independent Manager and the Franco Managers. The resulting framework favors Franco, because on any Interested Party Decision involving Macquarie, the Franco Managers alone comprise a majority of the remaining managers and can carry the vote. By contrast, for any Interested Party Decision involving Franco, the Macquarie Manager alone does not constitute a majority of the remaining managers; the Macquarie Manager must convince the Independent Manage to go along.

Because the decision to terminate Franco was an Interested Party Decision under Section 1.10 of the Holdco 3 LLC agreement, the only votes required to make the decision were those of the Independent Manager and the Macquarie Manager, as those terms are defined in the Holdco 3 LLC agreement. Summary judgment is granted in favor of the plaintiffs on this issue.

**C.      Whether The Independent Manager And The Macquarie Manager Could Act By Written Consent To Make The Termination Decision**

The plaintiffs seek a declaration that the Independent Manager and the Macquarie Manager could act by written consent to make the decision to terminate Franco. They could, and the resulting decision constitutes action by the Board of Managers of Holdco 3.

Section 4.3(d) of the LLC agreements addresses the Board of Managers' ability to take action by written consent. It states:

> Any action required or permitted to be taken by the Board of Managers at a meeting may be taken without a meeting if a consent in writing, setting forth

20

the action so taken, shall be signed (facsimile and electronically transmitted signatures acceptable) by the number of Board Members required by <u>Section 4.1</u> to approve such action at a meeting held by the Board of Managers at which a quorum was present.

This provision takes advantage of the flexibility granted by Section 18-404(d) of the LLC Act, which permits managers to act by non-unanimous written consent.[31] Under the Delaware General Corporation Law (the "DGCL"), by contrast, a board of directors can act only by unanimous written consent.[32]

---

[31] 6 *Del. C.* § 18-404(d) ("Unless otherwise provided in a limited liability company agreement, on any matter that is to be voted on, consented to or approved by managers, the managers may take such action without a meeting, without prior notice and without a vote if consented to or approved, in writing, . . . by managers having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all managers entitled to vote thereon were present and voted."). Section 4.3(d) of the LLC agreement goes beyond the default provision by requiring only consents from managers who would be sufficient to approve the action at a meeting at which a quorum is present. In this case, because Section 4.1(c) requires that all four members of the Board of Managers be present for a quorum, the distinction makes no difference. In another case, the difference between a hypothetical meeting at which a quorum was present and a hypothetical meeting at which all managers were present could be significant.

[32] 8 *Del. C.* § 141(f) ("Unless otherwise restricted by the certificate of incorporation or bylaws, any action required or permitted to be taken at any meeting of the board of directors or of any committee thereof may be taken without a meeting if all members of the board or committee, as the case may be, consent thereto in writing . . . ."). Stockholders, of course, can act by non-unanimous consent under the DGCL. *See* 8 *Del. C.* § 228(a) ("Unless otherwise provided in the certificate of incorporation, any action required by this chapter to be taken at any annual or special meeting of stockholders of a corporation, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted . . . ."). Like the default standard for manager action by consent under the LLC Act, Section 228 requires consents from stockholders holding enough shares to

Section 4.3(d) teaches that to determine whether the requisite actors have executed a consent, the reviewing party imagines a meeting of the Board of Managers at which all four Board Members were present. If the individuals who signed the consent could have approved action at that hypothetical meeting, then the consent was valid. In this case, Section 4.1(a)(ii) states that the only vote required at such a meeting would be "a majority of the Board Members other than the Franco Managers." Together, the Independent Manager and the Macquarie Manager constitute a majority of the Board Members other than the Franco Managers. They in fact constitute all of the of the Board Members other than the Franco Managers.

Franco makes a series of strained arguments against this result. First, he argues that the reference in Section 4.3(d) to "the number of Board Members required by Section 4.1 to approve such action at a meeting held by the Board of Managers at which a quorum was present" means that the action taken in the written consent "must, at a minimum, have been discussed by the necessary quorum of directors at a meeting."[33] That is not correct. The Holdco 3 LLC agreement and the LLC Act recognize two paths for valid action. The first is action taken at a meeting. The second is action taken by written consent without a meeting. The two paths have different requirements. The need for a quorum before valid action can be taken at a meeting does not apply to action taken by written consent, which

_____

take action at a hypothetical meeting at which all shares entitled to vote on the matter were present and voted.

[33] Def's Answering Br. at 35.

22

requires only that the consent be signed by "the number of Board Members required by Section 4.1 to approve such action at a meeting held by the Board of Managers at which a quorum was present."[34]

Franco argues that applying the plain language of Section 4.3(d) "would effectively render the quorum requirement *itself* a nullity, as no decisions would ever require a meeting if three directors supported action."[35] That is not true either. The quorum requirement continues to apply to meetings. Section 4.3(c) of the LLC agreements requires that the Board of Managers "meet at least on a quarterly basis." The quorum requirement also continues to have bite for purposes of action by written consent, because a reviewing party must envision a meeting at which a quorum is present to determine whether sufficient managers have executed the consent.

Franco also argues that applying the plain language of Section 4.3(d) would render meaningless language in Section 4.1(c), which states that "if the Managers fail to attain a quorum for three (3) consecutive properly noticed meetings of the Board of Managers solely due to the failure of the Macquarie Manager to attend or participate, then the other Managers may, by written consent or by special meeting, take such action notwithstanding the requirements of this Section 4.1(c)." This provision continues to have efficacy for purposes of the quorum requirement. It is true that the absence of consent from the Macquarie Manager would not prevent the other managers from acting by written consent

---

[34] Compl. Ex. M § 4.3(d).

[35] Def's Answering Br. at 35.

23

on matters other than Unanimous Board Decisions, but the presence of the phrase "by written consent" in this provision is not sufficient to imply a general requirement of unanimity for action by written consent. That implied term would conflict with the express language of Section 4.3(d) and with the default expectation of non-unanimous consent under the LLC Act. A party "is not always required to persuade the Court that its position is supported by every provision or collection of words in the agreement. Such pervasive success may be what a party aspires to achieve and such success may make the Court's task easier, but it is not essential."[36]

Under Sections 4.1(a) and 4.3(d) of the Holdco 3 LLC agreement, the Independent Manager and the Macquarie Manager could act by written consent to terminate Franco. Summary judgment is granted in the plaintiffs' favor on this issue.

**D.    The Effects Of The Written Consent At HMS Inc.**

The plaintiffs seek a declaration that the Written Consent constituted valid and effective action to terminate Franco's employment at HMS Inc. and remove him from his positons as President and CEO of that entity. Franco responds that any decision by the Board of Managers of Holdco 3 was a legal nullity because HMS Inc. is a separate entity from Holdco 3, and the Board of Managers of Holdco 3 has no authority over HMS Inc. In my view, neither of these extreme positions fits the facts. Instead, I believe that under the governance structure that the parties crafted, the parties to the Holdco 3 LLC agreement

---

[36] *Cyber Hldg. LLC v. CyberCore Hldg., Inc.*, 2016 WL 791069, at *7 (Del. Ch. Feb. 26, 2016).

24

made contractual commitments to implement certain decisions at Holdco 3's various subsidiaries. Those commitments bind the parties to the Holdco 3 LLC agreement, but they are not self-executing. Formal action remains required at the relevant subsidiaries. In this respect, these aspects of the Holdco 3 LLC agreement function much like contractual commitments in a stockholder agreement.

Godden and Bachteler take the aggressive position that if the Written Consent constitutes valid action on behalf of the Board of Managers of Holdco 3, then it automatically had a direct effect on Franco's status at HMS Inc., resulting in his termination as President and CEO of that entity. In my view, that position contravenes the bedrock principle of corporate separateness. With limited exceptions that are not applicable here, "the law must and does respect the separateness of the corporate entity without reference to the stockholder or the situs of ultimate power over its affairs."[37] Under Washington law, as under the DGCL, the board of directors of a corporation manages its business and affairs. The Washington Business Corporation Act states as follows:

> (2) Subject to any limitation set forth in this title, the articles of incorporation, or a shareholders' agreement authorized by RCW 23B.07.320:
>
> (a) All corporate powers shall be exercised by or under the authority of the corporation's board of directors; and
>
> (b) The business and affairs of the corporation shall be managed under the direction of its board of directors, which shall have exclusive authority as to

---

[37] *Pauley Petroleum, Inc. v. Cont'l Oil Co.*, 231 A.2d 450, 454 (Del. Ch. 1967), *aff'd*, 239 A.2d 629 (Del. 1968).

substantive decisions concerning management of the corporation's business.[38]

The Board of Managers of Holdco 3 is not the board of directors of HMS Inc. The plaintiffs have not offered any persuasive rationale as to how action taken by the Board of Managers of Holdco 3 could automatically constitute valid action on behalf of HMS Inc. In my view, there must be implementing action by HMS Inc.

Franco takes the equally aggressive position that even if the Written Consent constitutes valid action on behalf of the Board of Managers of Holdco 3, it is a legal nullity. As Franco sees it, only the governing body of an entity can make decisions regarding that entity's rights, so the only rights that the Board of Managers of Holdco 3 can address are the rights of Holdco 3. Franco posits that if a provision in Holdco 3's LLC agreement purports to let its Board of Managers address the rights of other entities, then that provision is a nullity.

Franco's argument is simple, straightforward, and has bright-line appeal. It would, however, render meaningless significant parts of the Holdco 3 LLC agreement. It is also inconsistent with the customary use of stockholder agreements, in which parties make commitments that can result in action at an entity.

First, under Franco's approach, virtually the entire Interested Party Decision definition and the related mechanics for the Board of Managers to make Interested Party

---

[38] RCW § 23B.08.010(2)(a)-(b).

26

Decisions would become surplusage. In its entirety, the Interested Party Decision

Definition states:

> "Interested Party Decision" means any following actions of any of the Company Entities:
>
> (a)     the exercise of, or the enforcement against the Sellers (or any Affiliate of any Seller) of, such Company Entity's rights under or with respect to any Acquisition Document, including the following:
>
>> (i)     any Company Entity's rights under Article XI of the Purchase Agreement with respect to indemnification;
>>
>> (ii)     the Sellers' covenants under Article X of the Purchase Agreement, including the restrictive covenants and releases;
>>
>> (iii)     Olympic Tug & Barge, Inc.'s rights under or with respect to the Duwamish Lease; and
>>
>> (iv)     HMS Inc.'s rights under the Employment Agreements, including any determination to terminate employment thereunder for cause.
>
> (b)     the enforcement of rights of HMS Inc. under or with respect to the Professional Services Agreement or any agreement with any Macquarie Party entered into pursuant thereto;
>
> (c)     the distribution by Holdco 1 to Holdco 2, and by Holdco 2 to the Company, and by the Company to MMS, of cash received by Holdco 1 under the Purchase Agreement (including Section 2.4(d) thereof) or any other Acquisition Document;
>
> (d)     the enforcement of the rights of HMS Inc. under or with respect to the agreement between HMS Inc. and Xoasis Networks, Inc. or the agreement between HMS Inc. and Focus Technology, LLC; and
>
> (e)     the enforcement of the rights of a Company Entity under or with respect to the Gulf Lease.[39]

---

[39] Compl. Ex. M § 1.10.

As noted previously, the term "Company Entity" is defined to mean each of the Holdcos, plus HMS Inc., plus each of HMS Inc.'s twelve subsidiaries.

From the standpoint of the Board of Managers of Holdco 3, the only actions it could take that would satisfy Franco's current position would be actions to enforce Holdco 3's own rights under subparagraphs (a) and (e). As to the other fourteen entities whose rights are covered by these two subparagraphs, the definition and related decisional provisions would be meaningless. For the same reason, the specific inclusion of subparagraph (a)(ii) would be meaningless, because it addresses the rights of Olympic Tug & Barge Inc., a subsidiary of HMS Inc. Subparagraph (c) would be meaningless to the extent that it covered action by Holdco 1 and Holdco 2. Subparagraphs (a)(iv), (b), and (d) would be meaningless because they address the rights of HMS Inc.

Ironically, Franco's argument would undercut a benefit he enjoys under the Holdco 3 LLC agreement. The inclusion of subparagraph (b) in the Interested Party Decision definition excludes the Macquarie Manager from any decision about enforcing the contractual rights of HMS Inc. against Macquarie. As discussed previously, this provision enables the Franco Managers to carry the vote on any decision involving the assertion of HMS Inc.'s rights under those agreements. Yet under Franco's interpretation, that beneficial provision would have no meaning, because the Board of Managers of Holdco 3 could not say anything about a right belonging to HMS Inc.

28

Delaware courts strive to interpret contracts, including LLC agreements, to avoid turning provisions into surplusage or rendering them meaningless or illusory.[40] In my view, meaning can be given to these aspects of the LLC agreement of Holdco 3 by recognizing that the parties treated that contract both as the governing document for Holdco 3 and as an investor-level agreement comparable to a stockholder agreement.

In a stockholder agreement, it is customary for parties to reach agreements regarding issues such as the board composition of the principal entity and its subsidiaries and the appointment of directors and officers.[41] Those agreements are not self-executing; they require mechanisms by which stockholder-level decisions can be implemented under the governing documents of the entity.[42]

In this case, the three LLC agreements and Franco's employment agreement were entered into contemporaneously to effectuate Macquarie's investment. The parties understood that HMS Inc. would be wholly owned by Holdco 1, which would be controlled by Holdco 2, which would be controlled by Holdco 3. The parties included provisions in

---

[40] *See, e.g.*, *CSH Theatres, LLC v. Nederlander of S.F. Assocs.*, at \*22 (Del. Ch. July 31, 2018).

[41] *See, e.g.*, Corp. L. Committee of the Ass'n of the Bar of N.Y.C., *The Enforceability and Effectiveness of Typical Shareholders Agreement Provisions*, 65 Bus. Law. 1153, 1155-60, 1169-70 (2010) [hereinafter, "Bar Report"] (discussing provisions in stockholder agreements that address the composition of the board of directors and the selection of officers); George D. Hornstein, *Stockholders' Agreements in the Closely Held Corporation*, 59 Yale L. J. 1040, 1042-44 (1950) (same).

[42] *See, e.g.*, Bar Report, *supra*, at 1157 (describing drafting considerations to implement a right to designate officers); *id.* at 1170 (describing drafting considerations to implement a right to designate officers).

the Holdco 3 LLC agreement that are often found in stockholder agreements, such as the Subsidiary Officer Provision and the Subsidiary Board Provision. The parties also included the sections addressing Interested Party Decisions, which predominantly implicate rights held by HMS Inc. and its subsidiaries. Finally, the parties included the Personal Commitment Provision, which obligates Franco personally to carry out his obligations under the Holdco 3 LLC agreement.

In my view, the provisions of the Holdco 3 LLC agreement, and any decisions that the Board of Managers or the members of Holdco 3 make in accordance with those provisions, bind the parties contractually as a matter of Delaware law just as a stockholder agreement would. If the members of Holdco 3 change the composition of the Board of Managers, then the parties to the Holdco 3 LLC agreement have a contractual obligation under the Subsidiary Board Provision to take steps to implement that decision at the subsidiaries. If the Board of Managers of Holdco 3 decides that an individual should be an officer of a particular subsidiary, then the parties to the Holdco 3 LLC agreement have a contractual obligation under the Subsidiary Officer Provision to take steps to implement that decision at the pertinent subsidiary. And if the Board of Managers of Holdco 3 makes an Interested Party Decision, then the parties to the Holdco 3 LLC agreement have a contractual obligation to carry it out.

In my view, the Personal Commitment Provision fits in with and supports this structure. By binding Franco to the Holdco 3 LLC agreement personally through the Personal Commitment Provision, the parties ensured that Franco would have a personal

30

obligation to abide by the provisions of the Holdco 3 LLC agreement and decisions made by the Board of Managers of Holdco 3 in accordance with those provisions.

This decision does not reach the question of whether a party to the Holdco 3 LLC agreement, including Franco, would be obligated to comply with a contractual obligation under that agreement notwithstanding competing obligations. For purposes of HMS Inc., compliance with a contractual obligation could raise knotty issues under Washington law, particularly if Franco asserts that compliance would cause him to breach his fiduciary duties.[43] The Washington Action is the proper place to litigate questions involving the parties' obligations at HMS Inc. This court's role is limited to declaring whether a contractual obligation exists.

### E.    Whether Franco No Longer Serves As Chairman Of The Board

The plaintiffs seek a declaration that under Section 4.1(d) of the LLC agreement, Franco can no longer serve as Chairman of the Board for the Board of Managers of Holdco 3. The plaintiffs are not entitled to this declaration until formal action is taken by HMS Inc.

Section 4.1(d) of the LLC agreement states, in pertinent part, that Franco shall serve as Chairman of the Board so long as "Franco has not been terminated by HMS Inc. 'for cause' under his Employment Agreement." The plaintiffs say that Franco has now been terminated for cause, so he no longer can serve.

---

[43] *See, e.g.*, Bar Report, *supra*, 1162-63 (noting that a contractual commitment may not ensure that a designated director votes in a particular way); *Restatement (Second) of Contracts* § 193 (Am. Law Inst. 1981) ("A promise by a fiduciary to violate his fiduciary duty or a promise that tends to induce such a violation is unenforceable on grounds of public policy.").

If Section 4.1(d) did not contain the words "by HMS Inc.," then I would agree with the plaintiffs. It seems logical to me that even though a decision by the Board of Managers of Holdco 3 to terminate Franco at HMS Inc. would require formal implementation by HMS Inc. to have effect at that entity, the decision still could have immediate effect for purposes of the internal affairs of Holdco 3. The specific language in Section 4.1(d), however, makes Franco's status turn on action by HMS. Inc.

To date, HMS Inc. has not taken formal action to terminate Franco. Until that occurs, the termination clause in Section 4.1(d) does not end his tenure as Chairman of the Board of Holdco 3.

## F. Whether The Governing Boards Of The Entities Must Be The Same

The plaintiffs seek a declaration that under the Subsidiary Board Provision, the composition of the governing boards of the Holdco entities, HMS Inc., and all of its subsidiaries must be the same. That is what the plain language of the Subsidiary Board Provision says, but it does not follow that change happens automatically at each of the other entities, nor does this provision govern who serves as Chairman of the Board of the various entities.

The Subsidiary Board Provision states:

> The composition of the board of managers or the board of directors, as applicable, of each other Company Entity . . . shall at all times thereafter consist of the same number of managers or directors, as applicable, and shall also consist of the same persons as that of the Board of Managers . . . .[44]

---

[44] Compl. Ex. M § 4.5.

The plaintiffs are therefore entitled to the declaration they seek.

This declaration should not be construed too broadly. Just as a decision by the Board of Managers of Holdco 3 to terminate Franco would not implement itself automatically at the level of HMS Inc., so too the obligations created by the Subsidiary Board Provision are not self-executing. In other words, if the composition of the Board of Managers of Holdco 3 changed, it would not be possible to declare based on that fact and the existence of the Subsidiary Board Provision that the composition of the board of directors of HMS Inc. automatically changed. The parties to the Holdco 3 LLC agreement would have contractual obligations to seek to effectuate that change, and a recalcitrant party could face contractual remedies for failing to comply with its obligations, but effecting the change would require valid corporate action at HMS Inc. The Subsidiary Board Provision is not self-executing, and the declaration provided by this decision does not imply that it is.

This declaration also does not extend the Subsidiary Board Provision beyond its terms, which cover the number and composition of the members of the governing boards and any observers, the methods for designating those individuals, and the manner by which the governing boards meet and act. During oral argument, plaintiffs' counsel suggested that if Franco ceased serving as Chairman of the Board at Holdco 3, the Subsidiary Board Provision would result in him no longer serving as Chairman of the Board at any of the subsidiaries. The Subsidiary Board Provision does not speak to who serves as Chairman of the Board. It also does not cover who serves as officers of the various entities.

33

## G. Whether Godden And Bachteler Validly Acted By Written Consent

The plaintiffs seek a declaration that Godden and Bachteler acted validly when they executed the Written Consent because they are, respectively, the Independent Manager and the Macquarie Manager. No dispute of material fact has been raised about Bachteler's status as the Macquarie Manager. Nor has any dispute of material fact been raised about the authenticity of their signatures on the Written Consent. Franco has, however, raised one narrow dispute of material fact regarding Godden's ability to act as the Independent Manager.

The dispute over Godden's status initially arose when Franco attempted to withdraw his support for Godden by email and took the position that Godden was no longer able to serve as Independent Manager as a result. In his answering brief, Franco abandoned that position.[45] Franco now contends that Godden is not an Independent Manager because he is not independent under the LLC agreements.

Section 4.1(b)(iii) describes the Independent Manager as a person who, among other things, is

> independent from and is not under the Control of or under common Control with [Macquarie], [Franco Partners] or any of their respective Affiliates (including pursuant to any contract or by virtue of being an existing or former employee of [Macquarie], [Franco Partners] or any of their Affiliates) . . . .

---

[45] Def's Answering Br. 33 ("Franco concedes that his email dated July 10, 2018 was insufficient by itself to remove [Godden] as the Independent Manager at each of the Holdcos."). This concession rendered moot the plaintiffs' request for declarations regarding the ineffectiveness of the purported removal. Franco also has filled a vacancy that was created when Padden resigned, mooting the plaintiffs' request for a declaration that he was obligated to fill it.

34

Based on Godden and Bachteler's joint action in the Written Consent, Franco asserts that Godden no longer meets the independence requirement.

At oral argument, plaintiffs' counsel suggested that Godden needed to meet the independence requirement only at the time of his election. That is one possible reading of the provision, but I do not regard it as a reasonable reading. In my view, the Holdco 3 LLC agreement established a governance structure in which the Independent Manager was expected to mediate between the Franco Managers and the Macquarie Manager by exercising his own judgment, free of external control or influence from either side. The agreement thus envisions ongoing independence. At a minimum, the implied covenant of good faith and fair dealing would prohibit either side from co-opting the Independent Manager after he was selected.[46]

It would not imply a lack of independence for the Independent Manager simply to side with either Macquarie or Franco. A decision of that type could be consistent with the Independent Manager acting in good faith to promote the welfare of the entity and all of its equity holders. In this case, however, at this preliminary stage, it is conceivable that Macquarie may have offered Godden inducements that undermined his independence. If that occurred, then it is possible that a court of equity would decline to give effect to the Written Consent.

---

[46] *See Dieckman v. Regency GP LP*, 155 A.3d 358, 369 (Del. 2017) (holding that plaintiff stated a claim for breach of the implied covenant of good faith and fair dealing where individual resigned from the board of the general partner so as to qualify for service as one of two members on a conflicts committee, then the two members jointed the board of an affiliate of the general partner immediately after the transaction closed).

Because of the way this matter has unfolded, Franco has not had the benefit of any discovery into any agreements, arrangements, or understandings that might exist between Godden and Macquarie. Franco is permitted to take targeted discovery into this issue. Resolution of this issue and a final declaration regarding the effectiveness of the Written Consent is likely to require a one or, at most, two-day expedited trial.

## III.     CONCLUSION

The plaintiffs' motion for summary judgment is granted in part as to the declarations set out in this decision.